BROWN *et al.*, *Appellants*, v. BALDWIN *et al.*

Division Two, March 13, 1894.

1. **Ejectment**: IMPROVEMENTS. An unsuccessful defendant in eject-
ment can not relitigate his title in an action under Revised Statutes,
1889; section 4645, for improvements and for injunction pending their
ascertainment.

2. ———: ———: NOTICE. A defendant in ejectment can not claim
the value of improvements as made without notice where the person
whose title was sustained informed him of his claim before the
improvements were made.

3. ———: ———. A successful plaintiff in ejectment is not estopped
to claim the defendant's improvements because he did not stop their
erection after having notified defendant of his claim.

4. ———: ———: CHATTELS. The right to chattels on the land is not
involved in an action for improvements by a defendant in ejectment.

*Appeal from Madison Circuit Court.*—HON. JAMES D.
Fox, Judge.

AFFIRMED.

*M. R. Smith* and *Wm. Carter* for appellants.

(1) Appellants maintain that under the petition
and subsequent pleadings in this cause the court should
have re-examined the title to the land described in
petition, if for no other purpose than to rightly
determine the question of good faith on the part of
appellants in making the improvements for which they
are asking compensation. Under this point will be
found the authorities in support of a liberal interpreta-
tion of the statute relating to compensation for improve-
ments made in good faith by occupying claimant;
also the authorities showing the equitable nature of

the statute and its real origin.   2 Story's Eq. Juris.,. sec. 1237 and note 4; *Bright v. Boyd*, 1 Story, 478; *Green v. Biddle*, 8 Wheat. 77; 2 Cent. Law Journal, 98; *Stump v. Hornback*, 109 Mo. 280; *Townsend v. Shipp's Heirs*, Cooke (Tenn.) 293; Sedgwick and Wait on Trial of Titles, etc., sec. 693 and note 3; sec. 694 and note 1; *Woodhull v. Rosenthal*, 61 N. Y. 382.   (2) Appellants maintain that they made the improvements on the land described in their petition in good faith,. believing that they had the right and privilege to do so. There is no question of equitable notice in the case, for the reason that defendant Carrie Baldwin, *nee* Pool, while claiming title to the premises, encouraged the making of said improvements when and where made. 1 Wash. on Real Prop. [4 Ed.], star page 3 and top p. 6, note 4; *Rerick v. Kern*, 2 Amer. Lead. Cases [3 Ed.],. 682, note p. 693; *Baker v. Railroad*, 57 Mo. 270, 273; *Kanada v. Railroad*, 76 Mo. 213, *et seq*; Story on Agency, secs. 90, 253, 260;  1 Wait's Actions and Def., sec. 12, p. 232; *Allen v. Mansfield*, 82 Mo. 695; *Desloge v. Pearce*, 38 Mo. 601; *Doty v. Gorham*, 5 Pick. 487; *Avery v. Railroad*, 113 Mo. 566; 2 Pomeroy's Eq. Juris., sec. 594 and secs. 601, 602;  2 Sugden on Vendors, secs. 27–30.   (3)  Appellants maintain that immaterial and irrelevant testimony was admitted by the court to fasten notice on appellants to the effect that they had notice of the Pool title at the' time of making the improvements.   Wade on Notice, sec. 29; 2 Pomeroy's Eq. Juris., secs. 602, 597;  Sedg. & Wait on Trial of Titles, sec. 696 and note 1 on p. 471; *Learned v. Carley*, 43 Miss. 687; *Vaughn v. Tracy*, 22 Mo. 418.   (4)  Appellants maintain that the trial court should have determined the issue as to the kind of property the machinery was, whether fixtures or not, in avoidance of further litigation, if for no other purpose.   R. S. 1889, sec. 2216; *Rush v. Brown*, 101 Mo.

592; *Kerr v. Simmons*, 82 Mo. 275; *Hicks v. Jackson*, 85 Mo. 294. (5) Appellants maintain that to permit respondents to take the land in question by virtue of a change in the county boundary lines would be in conflict with the plain provisions of the federal and state constitutions as to taking property without due process of law. 15 amend. Constitution U. S; State Constitution, art. 2, sec. 30; Cooley on Const. Lim. [3 Ed.], chap. 40, (star pages) 358, 362 and 363; *Clark v. Mitchell*, 64 Mo. 574 *et seq;* 22 Cent. Law Journal, 277; 27 Law Reg. 693; 30 Law Reg. 199; *Barlemeyer v. Iowa*, 13 Law Reg. 221. (6) Appellants maintain that to hold that Stoddard county had. fee simple title to the land described in appellants' petition, and that by changing the boundary line of that county, to thereby divest the title (a fee) out of that county, and to vest it in Bollinger county, would operate to impair the obligation of the contract between the county and state, as well as between the purchaser of the county and the county. Federal Const., art. 1, sec. 10; *Fletcher v. Peck*, 6 Cranch. 113; *McCracken v. Haywood*, 2 How. 612; *Ogden v. Saunders*, 12 Wheat. 259; 107 U. S. 769; 96 U. S. 595; Cooley on Const. Lim., star pages, 285 *et seq.* and notes.

*B. B. Cahoon* for respondent.

(1) The title to this real estate is *res adjudicata*, and under the facts can not be relitigated by appellants against appellees in this or any other suit. (2) The plea of no notice given prior to the passage of the act of March 14, 1859, which .first placed this real estate in Bollinger County, might have been made as well in *Pool v. Brown* as now. Not having been so made it can not be raised now. 74 Mo. 561; 76 Mo. 38; 63 Mo. 515. It could not even be raised now in *coram nobis.*

*Halford v. Alexander*, 46 Am. Dec. 253 and note; *Sanders v. State*, 16 Central L. Jour. 473–475; Freeman on Judg. 475. (3) The long acquiescence by the Cape Girardeau & Bloomfield Macadamized & Gravel Road Company in the act of March 14, 1859, and in the revision of 1865 (Revised Statutes, Missouri, 1865, sec. 50, p. 195), which placed these lands in Bollinger county estop it and its alleged grantees from questioning the validity of that change now. *Burgess v. Railroad*, 99 Mo. 496; *Landrum v. Bank*, 63 Mo. 48; *Bliss v. Pritchard*, 67 Mo. 181; *Sullivan v. Railroad*, 94 U. S. 806; *Oil Co. v. Marbury*, 91 U. S. 591; *Badger v. Badger*, 2 Wall. 94; *Kline v. Vogel*, 90 Mo. 230; *Kitchen v. Railroad*, 59 Mo. 514; Adams' Equity, 227. (4) An action for improvements under the statute, necessarily concedes the title to the real estate is in appellees. Revised Statutes, Missouri, 1889, secs. 4645–4654; *Stump v. Hornbeck*, 15 Mo. App. 372; s. c., 94 Mo. 26; *Dothage v. Stuart*, 35 Mo. 251–255; *Russell v. Defrance*, 39 Mo. 506. (5) The improvements were all made by Wm. Brown *et. al.*, with full and detailed knowledge and notice of appellees' title to the real estate before any of them were placed on the real estate. Therefore, appellants are not entitled to compensation on account of any of said improvements. Revised Statutes, 1889, secs. 4645–4654; Revised Statutes, 1855, sec. 20, p. 694; *Lee v. Brown*, 55 Mo. 400–403; *Stump v. Hornbeck*, 15 Mo. App. 372; s. c., 94 Mo. 26; *Valle v. Fleming*, 29 Mo. 152; *McQueen v. Choteau*, 20 Mo. 228; *Russell v. Defrance*, 39 Mo. 512; 35 Mo. 251–255. As to what is good faith and notice. *Green v. Biddle*, 8 Wheat. (U. S.); 1 Sedgwick & Wait on Trial of Titles to Land, pp. 461–487; *Ibid*, secs. 684–694, 716. One who knows the facts of the adverse title is to be charged with its legal effect. *Dart v. Hercules*, 57 Ill. 446; *Woodhull v. Rosenthall*,

61 N. Y. 395. One who knows the adverse title will not be allowed to say he believed it bad. *Levison v. Harris*, 14 S. W. Rep. 343; *Holmes v. McGee*, 8 S. W. Rep. 169; *State Bank v. Kercheval*, 65 Mo. 68; *Powell v. Rogers*, 11 Ill. App. Ct. 102; 85 Ill. 132. (6) This is not a case of improvements made between landlord and tenant, but of improvements made willfully by a trespasser, or at least by a stranger to the true title, and made against the will and wish of the owner, and in defiance of the true owner's title to the land.

GANTT, P. J.—This is a proceeding under the statute of this state for the value of improvements by the losing parties in an action of ejectment, decided in this court in *Pool v. Brown*, 98 Mo. 675. The improvements consist of a large stave factory, including the machinery used in manufacturing staves, the engines, boilers, kilns, buildings, etc., estimated to be worth $35,000 or $40,000. A temporary injunction was granted which was dissolved on final hearing and judgment rendered in favor of the defendants herein, the plaintiffs in the ejectment suit.

There are three main questions presented for decision, namely: Whether the title can be reinvestigated in a proceeding of this nature. What constitutes notice and good faith, and whether appellants acted in good faith. Also, whether the machinery of all kinds used in the manufacturing staves constitutes fixtures or chattels. The other questions are but corollaries of the foregoing. The trial court declined to reinvestigate the title, claiming the statute did not authorize it. It also held that appellants had notice of respondents' claim of title before making the improvements, and that such notice was in no ways neutralized, or waived by the conduct of appellants' agent in the ejectment suit. And further held that the question as to whether

such machinery was fixtures or chattels was not involved.

Appellants allege in their petition the history of their title, showing, first, that the land was patented to Stoddard county July 24, 1857, by B. F. Massey, secretary of state. They allege that the land in dispute was never selected as swamp land for Bollinger county, but was selected as such for Stoddard county; allege the sale and conveyance of the same by Stoddard county to the Cape Girardeau and Bloomfield Macadamized and Gravel Road Company; allege the sale and conveyance thereof by mesne conveyance to the appellants; allege that they and their grantors bought the same in good faith, believing at the time that they were acquiring a valid title thereto, and aver that they now and yet have the title, notwithstanding the judgment in favor of respondent Carrie Pool, now Carrie Baldwin, in the ejectment suit; allege the erection of a large stave factory on the land in controversy and the equipping it with all kinds of machinery used in the manufacturing of staves; allege that said machinery, engines, boilers, etc., are chattels; allege that respondent, Carrie Pool, now Mrs. Baldwin, knew of the erection of said stave factory and of all of the improvements made by appellants or their grantors; that she encouraged and acquiesced in the same; allege the understanding that after the title to said land had been settled, the same should be sold to William Brown by Carrie Pool for the sum of $5 per acre; allege that the acts changing the boundary lines between Stoddard and Bollinger counties, whereby territory was detached from Stoddard and attached to Bollinger, were unconstitutional and void; allege that to permit such acts of the legislature to stand as valid in this cause would be an infringement of certain provisions of the constitution of the state and the United States; allege that

Bollinger county never had any title to the land; that the title had long passed out of the state before the patent made by the state (dated August 4, 1869,) to Bollinger county for certain swamp lands, wherein was embraced the land in dispute; also allege the rendition of a judgment in the ejectment suit against these appellants as respondents in said ejectment suit, and damages in the sum of $1,000. The prayer is for the value of the improvements made thereon, for an injunction restraining the respondents from taking possession of the land described in the petition, and for general relief.

Respondents admit that they recovered judgment for possession of the premises described in the petition, with $1,000 damages, and admit that defendants appealed from such judgment to the supreme court, and that the judgment of the Bollinger county circuit court was affirmed, but deny all and singular each and every other allegation in said petition. Further answering, respondents allege that the land in dispute is swamp land; that it was patented to Bollinger county, and that defendant Carrie Baldwin, is the owner of it through mesne conveyance from Bollinger county and that she and her grantors had been owners in fee simple long before the pretended claim and title set up in the petition and that appellants have not now, and never did have, any title whatsoever, legal or equitable, or any vested rights in the premises; that by the judgment of the Bollinger county circuit court, she not only recovered the lands in petition, but a large amount of other lands; allege title and the history thereof, payment of taxes, etc.; allege that before making the said improvements by the appellants, they had actual notice and knowledge of respondents' title, and allege that respondent Carrie Baldwin by herself and her agents, gave them notice of her title, and that she pro-

tested against them entering into possession thereof, or doing anything whatsoever thereon, and continuously so protested, and that the improvements made thereon were willfully made; allege that the county court of Stoddard county had no authority under the law to convey the swamp lands of the county to the gravel road company, and that the acts of the said court in reference thereto were and are *ultra vires*, and that all the conveyances alleged in appellants' petition are void and no title passed thereby; allege the conveyance of the land described in the petition among other property to the Pioneer Steam Keg Works Company; allege that the Pioneer Steam Keg Works Company took said property charged with all the rights of the respondents therein, to wit: the full and complete title of and in respondents to all the said real estate and all of said improvements thereon, and that the Pioneer Steam Keg Works Company had no right to prosecute this action; allege that all the improvements alleged to have been made on said real estate are realty and fixtures, and pass and belong to respondents as a part of the recovery by them of said real estate in and under said judgment and proceedings in said ejectment suit, and pray judgment.

Replication consists of a general denial of all the new matter in the answer. It also denies specifically and by averment that the said Carrie Baldwin (or those under whom she claims) owned at the time of the institution of this suit, the fee simple title thereto, or any title whatsoever, but avers that the full title to all of said lands, and more particularly the land described in appellants' petition, is now and always has been in these said respondents and their grantors.

I. This action for improvements, and for injunction pending their ascertainment, is based upon sec-

tions 4645 *et seq.*, Revised Statutes, 1889, and the very practical question is now raised by the plaintiffs who began this action for said improvements, whether in this proceeding they can reinvestigate the title. The circuit court held they could not.

We think that plaintiffs, having invoked this statute and commenced their action under it, are limited by the scope of the statute itself. The action is given for improvements, and not for title. If plaintiffs are not estopped by the judgment in ejectment as to the equities in *Pool v. Brown*, 98 Mo. 675, they could bring their action of ejectment to try the title anew. If they are estopped by that judgment in ejectment then it is a bar in this proceeding as well as in another ejectment so far as the title is involved. The obvious intent and purpose of the statute was to afford relief to a defendant who had lost his possession or title by a judgment in ejectment, but who had made improvements in good faith, believing he had title. The statute does not countenance the view that an injunction will be granted to permit defendant to bring his counter action of ejectment. If he desires to do that, he must give up the possession and sue the successful claimant. We think that the circuit court was correct in holding that the petition of plaintiff's herein did not call for an investigation anew of the title as between plaintiffs and defendants. We know of no case under this statute in which it has been attempted to relitigate the title of defendant under the claim for improvements. The only purpose of setting forth his title was to show his color of title and the good faith of his possession.

II. What constitutes "notice" and "good faith" was settled in *Lee v. Bowman*, 55 Mo. 400. There it was held that both of these terms referred to their use in courts of equity and when the question arose in any

case as to whether improvements were made in good faith and without notice, resort must be had to the principles of equitable jurisprudence to ascertain under what circumstances those terms were applicable. It was then held that "notice in this connection does not mean direct and positive information, but anything calculated to put a man of ordinary prudence on the alert." In that case, the attorney of the Bowman heirs wrote Lee that they understood he claimed the land and intended building on it, and that they claimed title thereto and any improvements placed thereon would be at his peril, and "he was charged with knowledge of all those facts to which that clue, if properly followed, would have led."

On the other hand it is very generally held that the constructive notice of an adverse title which the law implies from the record of deeds, is not of itself sufficient to preclude a recovery for improvements if the occupant in good faith, purchased the land, believing he was obtaining a good title. *Whitney v. Richardson*, 31 Vt. 300; *Green v. Dixon*, 9 Wis. 532; *Hatcher v. Briggs*, 6 Ore. 31; *Cole v. Johnson*, 53 Miss. 94; *Dothage v. Stuart*, 35 Mo. 251.

In *Drey v. Doyle*, 99 Mo. 459, the distinction between actual and constructive notice is drawn in harmony with the most approved text writers (2 Pom. Eq. Jur., sec. 593; Bispham's Prin. of Eq. [3 Ed.], sec. 268), and it is said, "Notice is *actual* or *constructive;* and actual notice is divided into *direct* or *positive* and *indirect*, implied or *presumptive* notice; the difference between *presumptive* notice and *constructive* notice being that the former is an inference of fact which is capable of being explained or contradicted; while the latter is a conclusion of law which can not be controverted." Citing Bispham's Prin. of Eq., *supra*. "It is actual when the purchaser either knows of the existence of the

adverse claim or title, or is conscious of having the means of knowledge, although he may not use them. Constructive notice is a legal presumption, and will be conclusive unless rebutted, and in many cases it can not be gainsayed or denied, even by evidence of the absence of actual knowledge or notice." *Speck v. Riggin*, 40 Mo. 405.

In *Maupin v. Emmons*, 47 Mo. 304, the court said: "The actual notice required by the statute is used in contradistinction to the constructive notice given by a record. It does not mean that there must necessarily be direct and positive evidence that the subsequent purchaser actually knew of the existence of the deed. Any proper evidence tending to show it—facts and circumstances coming to his knowledge that would put a man of ordinary circumspection upon inquiry—should go to the jury as evidence of such notice." *Shumate v. Reavis*, 49 Mo. 333; *Whitman v. Taylor*, 60 Mo. 127.

These citations sufficiently demonstrate that in order to prevent an occupant recovering the value of the permanent improvements put by him on the land, he must have had notice of his adversary's title before constructing or making them; that this notice is not mere constructive notice which the deed records would impart, but actual notice as understood and defined by courts of equity, that is to say either actual knowledge of his opponent's title, or notice of some fact or circumstance that would lead a man of ordinary prudence to such an inquiry as would lead to knowledge of his adversary's title if honestly followed.

Applying these rules to this record, Mrs. Baldwin claims the plaintiffs erected these improvements with full knowledge of her title before any of them were made. The plaintiffs claim they had no notice of Mrs. Baldwin's title until after the improvements were all completed. In January, 1881, William Brown, the ancestor of

plaintiffs, advertised for from three thousand to ten thousand acres of good white oak timber land, suitable for a stave factory and saw mill employing fifty to one hundred men. Among those who answered was A. F. Pool, of Quincy, Illinois, who offered to sell him ten thousand acres within from two to ten miles of a railroad and river. In February following Pool inclosed in a letter to Wm. Brown a map and tax receipts of his lands in Bollinger county, Missouri, from which county Pool traces his title to said lands. On June 22, 1881, Pool requested the return of his map and was notified it would be sent June 25. On the twenty-fifth of October, 1881, Brown purchased the land in controversy from "the Cape Girardeau Railway Company" and received a warranty deed therefor to himself, Daniel S. Brown, Firman Jessup and Prentiss J. Batchelor. In November, 1881, Brown went on the land, selected the site for his stave factory and began clearing the timber and opening roads, etc. On the eighth of December, 1881, Mr. Brown received the following letter from A. F. Pool, Mrs. Baldwin's father:

"QUINCY, ILL., Dec. 8, 1881.

"Wm. Brown, St. Louis, Mo.

"DEAR SIR:—I am credibly informed that you and your employees are cutting timber on my land in Bollinger county, Mo. The evidence that you are so cutting seems to be ample.

"You can settle with me for such trespass if you wish. If not, I shall give you a chance for settlement in the U. S. Court.

"I offered to sell you these lands very low, but you did not see proper to buy but have gone to cutting off the timber.

"Very respectfully yours,

"A. F. POOL."

In reply to this letter, Mr. Brown wrote:

"ST. LOUIS, Mo., Dec. 9, 1881.

"*Mr. A. F. Pool, Quincy, Ill.*

"DEAR SIR:—Yours of the 8th inst. received, in which you claim that we are trespassing on your land in Bollinger county. We are surprised at this, as the only lands we bought there were from the gravel road company and Mrs. Frieda Tiedeman; before purchasing had the title to the land thoroughly investigated. The gravel road lands are lot 1 of nw qr, the e hf of lot 2 of nw qr and the s hf of sec. 5, all of sec. 8, all of sec. 17, all in twp 28, n, r. 10, e.

"Tiedeman lands:   W hf of lot 2 of nw qr of sec. 5, e hf of lot 2 of ne qr. lot 1 of ne qr and the se qr of sec. 6; the ne qr of the ne qr, the w hf of the ne qr and se qr of sec. 7, all in twp 28, n, r. 10, e.

"We are now at work in section 17, clearing a place for the purpose of putting up the factory buildings (which we certainly would not think of doing unless we thought we owned the land), and wish you would compare the above description with your list, as we think you are mistaken.

"Yours respectfully,

"WM. BROWN & CO."

"QUINCY, ILL., Dec. 13, 1881.

"*Wm. Brown & Co., St. Louis, Mo.*

"Yours of the 9th inst. is before me, and I have thoroughly examined the description of your lands and find that I own the land you bought of (the Gravel Roads land), lot 1 and e hf of lot 2, and n hf of se qr of sec. 5, and w hf of sec. 8, and se qr of sec. 5, and w hf of sec. 8, and se qr and e hf ne qr of sw qr of sec. 17, all in T. 28, n, R. 10, e, a little over 700 acres of land, all of which I have owned for many years; have my deeds running from Bollinger county, and abstracts of

title from the State of Missouri to the county and from the county to myself.   I have also my tax receipts for nine years, and you have my map and tax receipts, on both of which these lands was plainly marked, so you can have no excuse.

"I can only repeat my former proposition; you can settle with me if you wish.   My title to these lands are too well established to bear any litigation.   Every officer of the county knows these lands and my title to them, and I can make a general warranty deed to every piece.   Have you the title well looked up.   I wait a few days to hear your response.

"Respectfully yours,<br>"A. F. POOL."

"P. S.—I find every piece marked written on my deeds and tax receipts.   No mistake about that, and I know the lands, where and how they lay; have been over them.

"A. F. P."<br>"ST. LOUIS, Mo., Dec. 15, 1881.

"*A. F. Pool.*

"DEAR SIR:—Yours of the 13th inst. received, in which you seem to be very positive that you own a part of the lands that I bought of the Gravel Road Company, and have an 'abstract of title from the State of Missouri to the county and from the county to myself.'   This certainly looks as though you do own the land, and that I am the one that is mistaken and not you, but on the other hand I too have an abstract of title running from the U. S. to Missouri, from Missouri to the county of Stoddard, from the county to Gravel Road Company, from Gravel Road Company to Cape Girardeau railroad, and from the railroad to me.

"Now, there is one thing certain about this matter and that is, we can't both own the land.   If you own

it, I know I must make a satisfactory settlement with you, and will do so without putting you to any unnecessary trouble if you will allow me to do so.   You seem to think that in buying this land I was aware that you claimed it, but I was not.   Of course I know now, as you mentioned it in your letter, that I had your map and tax receipts and did know at one time what you claimed, but it never occurred to me when I was negotiating with the gravel road company that any of your land was claimed by them or *vice versa*.   I make this statement to correct the impression you seem to have that I knowingly bought the lands that you claimed, so that you may not have any personal feeling in the matter.   If I have made a mistake, that is all there is of it, and I know as well as you can tell me that I must suffer the consequences.   I shall take steps immediately to ascertain what are your rights and mine in the matter, and inform you at the earliest possible moment. In the meantime, as I am at work preparing a place to put up my buildings, and do not want to be delayed, I would like to know in case I find the title of the land in you, what you will sell the lands you claim in sec. 17, provided you do not think it inconsistent with your intentions to do so.

"Yours respectfully,

"WM. BROWN."

Thereupon Brown wrote Houck, of whom he bought, this letter:

"December 16, 1881.

"*Mr. Houck.*

DEAR SIR:—Yours of the 15th received.   It is just such a letter as I expected from you, and I feel encouraged.   Above is a copy of the answer I sent to the inclosed from Mr. Pool.   I shall not see Messrs. Glover & Shepley until I hear from him again.   The first time you write to me again, you can return his let-

ter.  If you happen to be in St. Louis, don't fail to come and see me, if you possibly can.

"Yours truly,

"WM. BROWN."

"QUINCY, ILL., Dec. 17, 1881.

"*Mr. Wm. Brown.*

"DEAR SIR:—Yours of the 15th inst. to hand and noted.  I am pleased with your frank, open statement of this matter.  My price for any or all of the lands you claim is $5 per acre, and no less and no more, because you may wish to use it.  When you tell me that your deed came from Stoddard county, I know what is the matter.  I have been over that before.  My lands are all in Bollinger county, and these lands were turned over by the state of Missouri to the counties in which they laid.  Stoddard county's claim to Bollinger county's land is worthless, but if you investigate you will find out that matter.  I know of these old claims of Stoddard county, but the lands being turned over as swamp lands to the county in which they lay, to be sold and applied to their school fund, the law will not allow Stoddard county to appropriate the funds of Bollinger county to her use, nor to take Bollinger county's lands.  These lands òf mine were all condemned as swamp lands, turned over to the county in which they lay.  This being in Bollinger county, I bought of Bollinger, and have paid the interest of this purchase into the school treasury of Bollinger county ever since, and I don't think they will stand by and allow Stoddard county to take their school funds from them.

"Yours for peace,

"A. F. POOL."

"*Mr. Brown, St. Louis Mo.*

"DEAR SIR:—As I have heard nothing from you lately with regard to the land matter, I wish to know what

conclusion you have come to. I think you have had ample time to satisfy yourself with regard to title and records. I have had the matter looked up, and am satisfied with my title and do not want the timber cut off my land. Please let me hear from you and oblige,

"Yours respectfully,

"A. F. Pool.

"This 10th day of January, 1882."

"Pioneer Steam Keg Works,
"Wm. Brown & Co. Prop'r.,
"St. Louis, Jan. 12, 1882.

"*Mr. A. F. Pool.*

"Dear Sir:—Your postal received. The reason you have heard nothing from me is because as yet I have nothing to say. I am having the matter investigated, and will let you know the result at the very earliest moment, and, as I have said before, if the title to the land is in you, I will pay you $5 per acre for it; but it is as much to your interest as mine, that when we do settle the thing we will know it is right.

"Yours truly,

"Wm. Brown."

"December 19, 1881.

"*Mr. A. F. Poole.*

"Dear Sir:—Yours of the 17th, in answer to mine of the 15th, is just received, and in saying the price you named is acceptable, allow me also to add that I appreciate your frankness and evident desire to do the fair thing in this matter, which is all I want. I am sorry there is any cause for difference between us, but I am glad to know that we can now settle it on its merits alone.

"Yours very respectfully,

"William Brown."

"QUINCY, ILL., Dec. 30, 1882.

"*Wm. Brown, Esq.*, *St. Louis.*

"MY DEAR SIR:—I write to say that I have parties offering me all that I ask for these lands at and above your stave factory (viz.: $5 per acre), but I do not wish to sell them without acting in good faith with you, and now offer them to you at that price if you want them. I will sell them to you first: that is, I will give you the refusal of the land at $5 per acre. If you do not wish to buy, I will sell them (they know what my title is). I enclose you T. P. plat, with my land marked, just 700 acres above the railroad and 160 below. You will please let me know by return mail what you wish to do. I am going to sell it.                    Respectfully yours,

"A. F. POOL."

Also plat referred to in above letter and accompanying same.

At the time of mailing above plat to Mr. Brown, the railroad marked on plat was not yet constructed, although the roadbed had been graded several years by a former company. On January 21, 1883, Mr. Brown responded to this last letter as follows:

"Yours of the thirtieth *ult.* to hand and in answer I have to say I cannot think of paying $5 per acre for the land under the circumstances."

This closed the correspondence. On August 3, 1883, Carrie Pool, now the wife of Thomas S. Baldwin, began her action of ejectment against Brown *et al.*, which resulted in the final judgment of affirmance in this court in *Pool v. Brown,* 98 Mo. 675. William Brown died in 1889.

The oral testimony shows that George W. Mollineaux was Mr. Brown's superintendent at Lutesville, at which place he had large saw mills and stave factory prior to moving on this land. Mollineaux

moved the engines, boilers, etc., to this land in August or September, 1882.   He went there with Mr. Brown and Mr. Weber the last of November or first of December, 1881, to select the site.   On the evening of the second day that he went down to this site, T. J. Shorb came to him where he was at work and notified him to keep off of his land.   Shorb inquired where he was going to locate the factory and when told in section 17, said he owned land in that section. Mollineaux told him that Brown and his partners had bought and had a warranty deed for section 17. He afterwards had a conversation with Shorb, in which Shorb said he didn't own the land where the factory stands, but it belonged to Mr. Pool, of Quincy, Ill.   Mollineaux advised Brown that Shorb claimed the land.   Brown said go ahead.   Plaintiffs objected to this evidence because Shorb in no way represented Pool and was not authorized to speak for him.

John Foley testified that he was employed for William Brown & Co., afterwards the Pioneer Stave Keg Works Co., of St. Louis; went to Brownwood in 1882 for the company.   In November or December, 1882, Pool came to the factory, which was on this land.   Foley was bookkeeper.   Pool introduced himself.   He had a plat showing Castor river and Hurricane or Cane creek slough.   "Pool said he thought our factory was on his land, but he was not here to stop the mill.   On the contrary he wanted it run and that any dispute about the land could be settled by him and Brown."

It also appears that Levering owned lands in this immediate neighborhood and that Brown's deed covered some of Levering's lands also and that in a correspondence, Brown was informed of the conflict

growing out of the conflicting claims of Bollinger and Stoddard counties to these lands.

While we think the evidence shows that William Brown honestly believed he had the title to this land, and his high character, as attested by counsel on both sides of this case, forbids the inference that he would have otherwise entered upon this land and constructed this factory, it is equally clear that notwithstanding his faith in his title, he was notified by A. F. Pool in writing and definitely of his claim to the land. Conceding that the notice given by Shorb was that of an intermeddler, still it held up to the written correspondence between Pool and Levering and William Brown, which clearly and fairly gave notice of their title, and brings this case clearly within the rule of *Lee v. Bowman*, 55 Mo. 400, and the doctrine of actual notice as defined in courts of equity, and deprives Brown and his heirs and successors of the benefit of the statute here invoked.

It is earnestly urged that Mrs. Baldwin is estopped because her father permitted Mr. Brown to proceed with his factory. We do not think so. He gave Mr. Brown notice of his title and agreed to take $5 per acre for the land. All his delays in resorting to law to oust Brown are most clearly attributable to Brown's offers to purchase and desire for time to investigate the title, and it was never until Brown peremptorily declined to purchase the lands, that Mrs. Baldwin began the ejectment suit.

Nor do we think that it affects the question, that Pool, when sick in 1879, attempted to convey this land to his daughter. It is urged that Carrie Pool did not obtain the legal title till 1883. This is true owing to a mistake in the description, but it follows then that the legal title was in her father all the time he was negotiating with Mr. Brown, and when

finally he perfected this title, by correcting the deed, she became possessed of his rights.

The evidence is not sufficient to justify a court of equity in decreeing a specific performance of a contract of sale at five dollars per acre.

Again it is urged that the circuit court erred in not deciding what part of these improvements, if any, were fixtures and what portions, if any, were chattels, but we do not think the court, under the proceedings, was required to do that. The action was brought solely for these permanent improvements which had by force of law become a part of the realty. The court held that plaintiffs were not entitled to recover anything on this ground, and the petition had not proceeded on the ground that they were chattels. The judgment was not bar to their removal of such as were chattels, nor did it preclude their claiming them in any subsequent action if necessary. We think the judgment of the circuit court should be and it is affirmed. All concur.