KATHERINE MARTIN, Appellant, v. MARIE McCABE, Respondent.—No. 40756. 213 S. W. (2d) 497.

Division Two, July 12, 1948.

Motion for Rehearing or to Transfer to Banc Overruled, September 13, 1948.

*W. D. Tatlow* and *Arch A. Johnson* for appellant.

*Warren M. Turner* and *Louren G. Davidson* for respondent.

[498] ELLISON, J.—This action by appellant was started under Sec. 1684[1] as a suit to determine title to the land described in the margin,[2] which for brevity we hereafter refer to as a "tract". It wound up with the concession that the defendant-respondent owned an undivided half interest therein; a prayer for partition; and the assertion by appellant of an equitable claim and lien against respondent's said half interest in the sum of $12,000, this being one-half the amount expended by appellant in placing improvements on the land and discharging tax liens thereon, in alleged good faith and ignorance of the true state of the title. Appellant says it is essentially an action in equity for unjust enrichment, as to the improvements. The chancellor found and decreed for respondent as to the improvements; for appellant as to the tax liens; and ordered partition by a sale of the land and apportionment of the proceeds.

Appellant is the niece of Byron Crutcher, a man of considerable experience in real estate developments in the City of Springfield. He promoted the opening, paving and curbing by special assessment of a street crosswise of a tier of lots in Country Club Place, dividing them into half lots, including the one here involved. He then bought, among others, two of the tax bills against the tract in controversy for about $300, and gave them to appellant as a gift.

[1]All references to our statutes are to R. S. Mo. 1939-Mo. R. S. A.; and italics in quotations are ours unless otherwise noted.

[2]All of the west half of Lot 10 of Country Club Place, an addition to the City of Springfield, Missouri, except the south 20 feet thereof used for road purposes and except the east 25 feet thereof used for street purposes, all in the City of Springfield, Greene County, Missouri.

Thereafter he furnished all the money and did all the acts in her name and behalf which figure in this case. And so, while he is not a party to the record, he was appellant's agent and alter ego. He caused the tax bills to be foreclosed by suit, and bid in the tract at the execution sale, taking the sheriff's deed in appellant's name. Thereafter he paid the taxes against the tract, graded it, and built two dwelling houses thereon, under the innocent and mistaken belief —he testified—that appellant was the owner thereof. His total outlay was $24,000, of which appellant now seeks to recover one-half from the respondent, on the concession that she is a tenant in common owning an undivided half interest in the land. That is the principal issue on this appeal, and it depends on whether Crutcher acted *in good faith* in making the foregoing expenditures.

Stating the facts more fully and in order of date. The record title to the tract was in the name of "Miss Bessie McCabe of Los Angeles, California," as devisee under the will of Lawrence Sansone, deceased, a brother of Charles Sansone of Springfield, who was executor of the will and a friend of Crutcher's. Crutcher knew Bessie McCabe owned the tract and where she lived, for he wrote her in California in March, 1941, offering to buy it. The tax bills involved were issued a year later in March, 1942. Crutcher bought them in April, 1943. They were issued only against the *east* half of the tract, but a little over two years later, in the fall of 1945, he took them to the City Clerk, complaining that they should cover the whole tract. The City Council passed ordinances cancelling [499] the old tax bills and authorizing the issuance of new ones accordingly, under Sec. 6782. This change was not made in the tax bills against any other lots (1 to 9) in the tier. The new issue of tax bills did no bear the date of their own issue, as the statute required, but were dated back to the date of the old tax bills of 1942, thereby making it appear three installments were past due thereon, when in fact they were not. This rendered void the new tax bills and the judgment thereon.

Crutcher testified he notified Bessie McCabe as each installment on the tax bills came due, but none of these notices were ever acknowledged or returned undelivered. In 1944 and 1945 he talked to Charles Sansone several times about the tax bills and whether any of the family would pay them. He admitted Sansone told him Bessie McCabe had died and that Lawrence Sansone had a living sister, Mrs. Staggs, but denied he was informed as to Bessie McCabe's heirs. He gathered from what Sansone said that these relatives did not want to get involved in any family affairs and were not interested. In fact he said he learned from Sansone "that there was no one that was interested in the bill (the two tax bills) to protect it," and was told the way to do would be to bring suit thereon.

At the time of trial below it was stipulated that on account of Sansone's physical condition he was unable to testify or give his deposition. But it was shown that he had employed the law firm of Haymes & Dickey to look into the matter, and had authorized them to disclose the contents of their file of correspondence to both parties to this suit. Mr. Dickey testified and produced the file at the trial. In it was a letter from a California lawyer dated June 11, 1945, addressed to Mr. Sansone—with whom Crutcher had been conferring—which stated Bessie McCabe, deceased, was survived by a sister, Mrs. Mary L. Harrington, and a niece Mary McCabe, who four years theretofore was living in St. Louis, However it expressed the opinion that the tract was not worth redeeming. So it seems the foregoing information was in Sansone's possession when he talked to Crutcher, though he may have been inclined to the view that the value of the tract would not justify payment of the tax bills thereagainst.

At any rate appellant brought suit to foreclose the tax bills six months later on December 20, 1945, against the unknown heirs of Bessie McCabe, apparently without any further effort to find out who and where they were. He recovered a default judgment based on service by publication on March 16, 1946, under which the tract was sold at execution sale to appellant, and a sheriff's deed was executed to her, which was recorded on April 24, 1946, in Book 687, page 367, Recorder's Office, Greene County. It should be stated Crutcher did not disclose to the lawyer who brought the suit that the tax bills, which were fair on their face, actually were a reissue of later date, and with a different land description.

This lawyer testified from recollection that Crutcher did not tell him he could find out who the heirs were, but did say he (Crutcher) had talked to Mr. Sansone; and the witness further stated he felt "reasonably certain" that "Charley" (Mr. Sansone) had told him he did not know who the heirs were, or where they might be found. Whether this was before or after Sansone had received the letter of June 11, 1945, from the California lawyer does not appear. Appellant did not begin to make the improvements on the tract, upon which his present claim to reimbursement is based, until April, 1946, after he had whatever information he had got from Sansone, and after the judgment in the suit on the tax bills had been obtained.

Near the end of that year (1946) another law firm in Springfield was employed to examine the abstract of title to the tract, in view of a contemplated sale thereof involving the obtention of a "G. I." or Government loan. Certain requirements on the title were made which disturbed Crutcher, and he, or the Union National Bank of Springfield, employed one of appellant's present counsel, Judge Johnson, about March 1, 1947 to look into the matter.

124

Within a few days Judge Johnson got in touch with one of Bessie McCabe's heirs, Mary L. Harrington, through the assistance of Charles Sansone and his aforesaid attorneys, [500] Haymes & Dickey, the latter also informing him that there had been another surviving heir, Miss Mary McCabe—the respondent. Mrs. Harrington's attorneys advised him Miss McCabe's last known address, ten years before (their letter in the Haymes & Dickey file said *four* years) had been the Board of Trade Building in St. Louis. She had changed her name from Mary to Marie because of confusion with another Mary McCabe in St. Louis. Some little difficulty was encountered because of this fact, but within two months Judge Johnson had located her there and got in communication with her. As a result of his efforts a quitclaim deed was obtained from Mrs. Harrington for $50, but the respondent refused to sell without further investigation, and appellant brought this suit on May 15, 1947.

At the close of all the evidence, counsel for respondent requested the chancellor to make findings of fact and conclusions of law under Sec 114(b) (d) of the Civil Code. His findings of fact were in accord with the foregoing recital, except that he found Crutcher gained no information from Charles Sansone as to who Bessie McCabe's heirs were and where they were, notwithstanding the letter of June 11, 1945, disclosing those facts, which Sansone had received some six months before the tax bill suit was brought. On that point the chancellor commented: "Why Crutcher did not obtain this information when he inquired of Charles Sansone is not explained."

In his conclusions of law the chancellor noted the provision in our statute, Sec. 1548, that one dispossessed of land may recover compensation for improvements made thereon in good faith prior to having had notice of the adverse title thereto. Continuing, he pointed to the glaring defects in the new tax bills, dated back to the issuance of the original tax bills in 1942 concededly in violation of Sec. 6782, and including more land than was covered by the original special assessment proceedings. Then he held that even if Crutcher did not know the legal effect of these facts they furnished a *clue* which he should have investigated before he began to improve the tract, and which would have disclosed his defective title if he had followed it out. In other words, he held the facts constituted "notice within the meaning if Sec. 1548", supra.

The chancellor further reasoned that since Crutcher knew Sec. 6782 authorized the issuance of the tax bills, he must be presumed to have known also that the same statute further forbade dating them back. And he added that even if Crutcher did not know the legal effect of the foregoing facts, nevertheless he was bound to follow the clue which was furnished by those known facts. The chancellor also pointed out that Crutcher did not furnish this information to his attorney who brought the suit on the reissue tax bills over

three years before his cause of action accrued—because of the pre-dating of the tax bills.

Further the chancellor commented on the fact that Crutcher knew the name and address of the record owner of the tract, Bessie McCabe, in 1941 and tried to buy it from her; that he also knew of her death; but that thereafter he made only half-hearted attempts to locate her heirs; caused the tax bills to be reissued covering the whole tract instead of half of it, as originally; and then brought the tax bill suit against her unknown heirs. This, said the chancellor, "strongly smacks of a plan to acquire the fee title and circumvent the owners through the forms and technicalities of the law."

In support of these legal conclusions, as applied to the claim of a dispossessed occupant of land for compensation for improvements made thereon in ignorance of an outstanding better title, the chancellor cited nearly all of the Missouri decisions listed below[3]—which are also cited by both appellant [501] and respondent. He quoted from the *Schaffner* case[3] on the point that "ignorance which is the effect of gross negligence seems to furnish no ground for equitable relief;" and that "ignorance of the law . . . furnishes (no) exception to the general rule." And on the effect of the occupant's "honest belief" that his own title is good, the following is quoted from the *Richmond* case:[3] "Notice of a title adversely held is incompatible with good faith, regardless of the opinion of the occupant concerning the validity of such title." From the *Lee* case[3] the doctrine is quoted that: "Notice . . . does not mean direct and positive information, but anything calculated to put a man of ordinary prudence on the alert, is notice . . ." In addition, the following is substantially quoted from 42 C. J. S., p. 436-7, Sec. 7 (4) (b):

"One is an occupant in bad faith where he has actual notice of the adverse title, or what is equivalent thereto . . . notice of some fact or circumstance which would put a man of ordinary prudence to such inquiry as would, if honestly followed, lead to knowledge of the adverse title. . . . the occupant is bound to know the defects apparent in his own title papers."[3]

Appellant's counsel vigorously assail these conclusions, particularly the last sentence of the last quotation, stating the occupant is bound to know the defects apparent in his own title papers.

[3]Lee v. Bowman, 55 Mo. 400; Brown v. Baldwin, 121 Mo. 106, 114-6, 125(2, 3), 25 S. W. 858, 859, 862(2, 3); Seibel v. Higham, 216 Mo. 121, 133-4, 140 (5, 8), 115 S. W. 987, 990, 993(6, 11); Gray v. Clement, 296 Mo. 497, 512(7), 246 S. W. 940, 943-4 (6-8); Otten v. Otten, 348 Mo. 674, 681(3), 156 S. W. (2d) 587, 590(7).
Schaffner v. Schilling, 6 Mo. App. 42, 46-9(3); Gallenkamp v. Westmeyer, 116 Mo. App. 680, 689(3), 93 S. W. 816, 819(4); Richmond v. Ashcraft, 137 Mo. App. 191, 199-201 (2-4), 117 S. W. 689, 692-3 (1-5); Brandon v. Stone, 237 Mo. App. 671, 676-7, 162 S. W. (2d) 83, 86(2-4).

Their brief insists that is equivalent to binding him with constructive notice under the recording Act (Sec. 3427), which conclusively imparts notice of a duly recorded deed of land to subsequent purchasers thereof. It is their contention that the occupant must have *actual* notice of the prior adverse title from outside collateral facts, and that he need not possess expert knowledge of the inherent weakness of his own title papers. They say if it were otherwise a claimant seldom could recover for such improvements. This argument is directed against the chancellor's conclusion of law that Crutcher was bound to know the reissued tax bills were void, and that any judgment based thereon also would be void.

Appellant is right in saying the occupant in a case such as this, must have actual notice of the outstanding better title. It was so declared in the *Brown* and *Richmond* cases, supra.[3] The Richmond case lays down three propositions: (1) as regards his *title* the occupant is bound with *constructive* knowledge of a prior recorded conveyance in the chain of title, even though he purchased in good faith; (2) as regards his claim for *improvements* made in good faith, he must have had *actual* notice of the better adverse title when he made them; (3) but he may be charged with actual notice of the ultimate fact (a better adverse title) from proof that he knew other facts which, if followed up, would have led to notice. And such is the general rule, though it is more strict in some jurisdictions and less so in others. 31 C. J., p. 324, Sec. 32; 42 C. J., p. 436, Sec. 7(b), 27 Am. Jur., p. 270, Sec. 14, p. 272, Sec. 16.

The foregoing does not require the occupant to have the expert knowledge of a lawyer, as is established by the *Gallenkamp* case, supra,[3] written by the same author as the later Richmond case. In the Gallenkamp case the occupant of land had been ousted in an ejectment suit, and thereafter brought suit for compensation for improvements he had put on the land. In good faith he thought he owned the fee simple title. But in his chain of title was a sheriff's deed in partition. Certain minor defendants in the partition suit had been improperly served with process and the judgment was void as to them. The decision said: "In our judgment that technical deficiency in the mode of service, though fatal to jurisdiction, was not of a character which a purchaser at a judicial sale, or a subsequent purchaser, unless he happened to be a careful lawyer, was likely to detect. But the essential matter in this connection is the good faith in which the improvements were made—the fact that the party in possession made them believing he had a good title; not that, by a recondite investigation, he might have ascertained he had a bad or a limited one."

[502] The same rule was followed (citing the Gallenkamp case) in Shanklin v. Ward, 291 Mo. 1, 18-9(3, 4), 236 S. W. 64, 68(3).

In that case there was a fatal flaw in the dispossessed occupant's chain of title, namely a guardian's deed, the guardian having been appointed in an insanity proceeding of which no notice had been given to the lunatic. Nevertheless it was held the occupant could recover for improvements put on the land in the bona fide belief that he was the owner in fee simple. The decision classified this as a "mistake of law." And a similar ruling was made in Rains v. Moulder, 338 Mo. 275, 285(5), 90 S. W. (2d) 81, 86(13), a case stressed by appellant, where in the chain of title a probate court had undertaken to sell a homestead to pay debts of the decedent.

█ The general rule is that equity was plenary power to relieve for a mistake of fact,[4] but will not relieve for a mistake of law.[5] However this latter rule had been greatly enlarged, or modified, especially as regards a mistaken belief in one's title to property, which, it has been said, partakes of the nature of a mistake of fact. This is especially true where the mistake was mutual, or the parties were equally placed, and there was no disparity in their respective positions, information or means of information, or their intelligence, so that they could deal with each other on equal terms, and did so deal without blamable negligence or overreaching. In such a situation the title defect would have to be such as would prompt an ordinarily prudent man to further inquiry, as the Lee case, supra,[3] says.

But this does not mean one better informed or equipped than the average man will be held only to such precautions as the latter would have exercised. For that reason the Gallenkamp case conceded a *lawyer* might be bound by his record title. But in the instant case Crutcher was not a mere layman depending on the law to take its course in a matter with which he was unfamiliar. He was experienced in real estate developments. He had bought perhaps as many as a hundred tax bills. He had promoted the very paving improvement for which the instant tax bills were issued. He was the actor in having the tax bills changed. He knew the statute (Sec. 6782), or at least the law, provided for the reissue of erroneous tax bills. In the next sentence the statute provided those tax bills must bear their own date. He caused the instant tax bills to be changed so they would cover the whole tract, whereas the tax bills on the other tracts in the tier were not changed. He was or had been interested in at least one of these latter.

Furthermore, as the chancellor concluded, there is some reason for thinking Crutcher bought the tax bills and instituted the tax bill foreclosure suit for the purpose of acquiring the title to the tract,

[4]19 Am. Jur. p. 73-80, Sec's. 53-61; 21 C. J., p. 86-93, Secs. 62-67; 30 C. J. S., p. 374-8, Sec. 47a.

[5]19 Am. Jur., p. 81-7, Secs. 62-72; 21 C. J., p. 93-8, Sec. 69; 30 C. J. S. p. 378-381, Sec. 47b.

and not merely to collect on the tax bills. He knew the title was in Bessie McCabe, knew her address, and tried to buy the tract from her in 1941, before he bought the tax bills in 1943. In 1945 he knew she was dead and had left heirs. He was in frequent consultation with Charles Sansone, executor of the will through which Bessie McCabe had succeeded to the title.

He knew she had left *some* heirs, and that Sansone was in a position to put him in touch with at least a part of them. He testified Sansone never disclosed to him that Mrs. Harrington and Mary McCabe were the heirs, but did say Sansone told him "no one was interested in the bill (tax bills) to protect it," and that the only thing for him to do was to sue on the bills. He did that by suing the unknown heirs of Bessie McCabe, and got a default judgment based on service by publication, without disclosing to his attorney any of the facts that made his position vulnerable, and without any further effort to get in contact with those heirs, as Judge Johnson easily did afterward.

It may be true as appellant's counsel contend that appellant, acting through Crutcher, in bringing the tax bill suit, did all she was required to do under Sec. 897: by verifying her petition therein; alleging that the names of the defendants were unknown [503] to her and discribing their interests and how derived; and then obtaining service upon them by publication as unknown heirs of Bessie McCabe. That was at least prima facie good, and we have no desire to overturn such established and necessary procedure. Nevertheless, an element of good faith underlies all such proceedings. As is said in 47 C. J., p. 175, Sec. 324: "The ignorance of the name must be real, and not willful, ignorance, or such as might be removed by mere inquiry, or a resort to means of information." So, likewise, the rule stated in 30 Am. Jur., p. 856, Sec. 7 is: "The very basis of the statutory procedure against unknown parties is that parties so proceeded against are in fact unknown. If the reason they are unknown is merely because the plaintiff does not take the trouble to inquire info the question of their identity, the failure to make the inquiry defeats the right to invoke the statute."

It is conceded in the instant suit that the judgment in the tax bill case turned out to be void for other reasons than the foregoing. But that, in our opinion, does not prevent us from taking into consideration the facts stated in the second and third preceding paragraphs, which indicate Crutcher may have preferred to remain in ignorance of the names and addresses of the heirs of Bessie McCabe when he brought the tax bill suit. On all the facts we think appellant, through Crutcher, was not a purchaser in good faith within the meaning of the law. This, in our opinion, accords with the prevailing doctrine elsewhere. 142 A. L. R., p. 349, Annotation. The infirmity in his title was not a remote invalid conveyance in

the chain of title, with which he had had no contact. It was a defect of his own personal making, namely, the void tax bill suit which he had brought to extinguish the known outstanding interests of *some* heirs of Bessie McCabe whom he made no real effort to find, even granting he did not know who and where they were. Any contention that it was merely a bona fide action to collect the tax bills obviously is untenable. No one would sue unknown and unlocated heirs for the sole purpose of collecting money from them personally. The tract here was bid in for $492.44.

Appellant's counsel have cited and quoted from one other decision, Seibel v. Higham, supra.[3] The facts there were complicated, and we shall not attempt even to sketch them. It was a suit in equity to set aside deeds to land whereby a defendant mining company had purchased land and made mining improvements thereon. The title was bad because of a void conveyance in the chain of title. On the question whether the mining company could recover the value of the improvements made by it the opinion said:

"The nature of the alleged improvements, whether they consisted of permanent buildings or moveable machinery, whether or not they really added value to the property, was not shown. Defendant corporation could not, by placing improvements on the property, infuse any force into its void title, and since the defendant took possession charged with knowledge of plaintiffs' interests and made whatever improvements it did make in defiance of those interests, it is not entitled to have those improvements taken into account in the adjustment of the equities growing out of these complicated transactions, *unless the improvements can now be removed without injury to the real estate as mining property.* Of course, if they are valuable improvements or equipments to the mining plant their removal would necessarily reduce the value of the plant as it now stands, taking the improvements or equipments into account, but by the term injury to the real estate as mining property used in connection as above we mean injury that cannot be repaired by replacing other improvements or equipments of like character at the cost of their present value. . . . It would neither be right to give the plaintiffs the benefit of the defendant's improvements if it can be avoided, nor would it be right to allow the defendants by tearing away and removing their improvements to injure the real estate as mining property."

At the end, the opinion remanded the cause with directions to take an inventory of the improvements and machinery; the present value of the land with and without [504] them; whether they were permanent and enchanced the value of the land; whether they could be removed, and what effect such removal would have on the value of the land as mining property; and what the profits of the company had been during its occupancy. It then directed that if the account-

ing showed the value of the land exceeded the profits, the company should be permitted to remove improvements to the amount of such excess, so far as could be done without injury to the land as mining property.

Appellant's counsel say the italicised part of this Seibel decision modifies the law of this state as to the rights of a dispossessed occupant of land. No authorities are cited by it, nor has it ever been cited on that point, except in 129 A. S. R. 502, which reports it, and says it stated the rule applicable to *mining* land. The general rule is that any permanent improvement placed upon the land of another, by one having no interest or title therein, without the owner's consent, prima facie becomes a part of the realty, belongs to the owner of the fee and cannot be removed, although it was placed thereon by mistake, unless the improvement was regarded and intended to be personalty, and not real estate.[6] If the improvements were made by consent of the owner of course the situation is different.

It would seem the same would be true even without such consent under Sec. 1548 if the improvements were made by someone bona fide believing he was the owner. But certainly the Seibel decision did not say, or mean to say, that rule would apply when they were not made in good faith. Appellant's counsel also discusses extensively the doctrine of unjust enrichment, and cites many foreign decisions thereon. They argue this doctrine broadens the rule heretofore prevailing in this state. But we think the clean hands doctrine is still one of the fundamental principles of equity, and that it applies here under all the facts.

The trial court decreed partition by sale and an accounting by respondent to appellant for the general and special assessment taxes, with interest, which the latter has paid on the tract. The decree is affirmed and the cause remanded for further proceedings by the circuit court in harmony therewith. *Leedy, J.,* concurs, *Tipton, P. J.,* not sitting.

---

[6]31 C. J., p. 309, Sec. 3, p. 311, Sec. 7; 42 C. J. S., p. 423, Sec. 3, p. 425, Sec. 4; 41 C. J., p. 485, Sec. 404; 26 C. J., p. 673, Sec. 30; Holtgreve v. Sobolewski, 326 Mo. 412, 424(2), 31 S. W. (2d) 993, 998(5).