## NATHANIEL SHANKLIN, Appellant, v. HENRY A. WARD et al.

Division One, December 19, 1921.

1. **GUARDIAN: Furnishing Money to Ward's Family: Volunteer: Reimbursement.** A person who acted as guardian and curator of an insane person in the honest belief that his ward had been legally adjudged to be insane, whereas such attempted adjudication was void because no notice of the lunacy inquiry had been given as the law requires, and who during the pendency of such guardianship advanced money to the insane man's wife, which was used for her support and the maintenance and education of his children, although in a technical sense a volunteer, is entitled to be reimbursed out of the insane man's estate for the money so advanced.

2. **EQUITABLE LIEN: Purchase of Land from Guardian: Guardianship Illegal: Use of Proceeds.** Where the adjudication in the probate court in the lunacy inquiry was illegal because the insane person had not been given notice, the purchaser in good faith of the insane man's land from the appointed guardian, who acted in good faith throughout in the honest belief that he was a legal

guardian, the purchase money being used to support the insane man's wife and for the maintenance and education of his children, and by its payment the guardian obtaining a release from the wife of her inchoate dower, whereby he was enabled to sell the insane man's real estate at a fair value and pay his pressing debts, is entitled to an equitable lien on the land so purchased for the purchase price, with interest, regardless of the form the transaction took.

3. ———: **Purchase in Good Faith: Constructive Notice.** The purchaser of land from the guardian of an insane person, in good faith, for full value, without notice of any infirmity in the title, is entitled to have the land charged with the purchase price and with the amounts expended by him in the payment of taxes and in the making of permanent improvements, with interest, less the rental value, with interest, from the date of the purchase from the guardian, although the probate court records showed that said insane person was adjudged insane in a lunacy inquiry without notice to him, and the appointment of said guardian and the sale of the estate land by him were therefore void. In such case, the doctrine of constructive notice is inapplicable, and the purchaser's good faith can be challenged only on the ground that he had actual notice of the defect in the title, or knowledge of such facts and circumstances as would have put a man of ordinary circumspection upon inquiry.

4. ———: ———: ———: **Mistake of Law.** Where manifest justice and equity require it, a court of equity will relieve one from the consequences of a mistake as to title to real estate, even though the mistake is one of law. Even if the purchaser of land at the time he received a deed from the guardian of an insane person and paid the purchase money knew that the proceedings in the probate court were had without notice to said insane person, yet, unless he also knew that by reason thereof the proceeding was void, or that the guardian had no title, he will not be precluded from relief, but is entitled to be reimbursed for the amount of purchase money paid to the guardian and for the moneys expended on the faith of his title in making permanent improvements and discharging liens, with interest, less the rental value of the premises, with interest.

5. ———: **Mortgage: Payment of Interest to Protect Equities.** Where the defendant had purchased town property, in good faith and without notice of any infirmity in the title, from the guardian of an insane owner, and thereafter said owner was restored to his right mind, and the title was in such a state of uncertainty that neither could borrow money on it without the other joining in the

lien papers, and both joined in the mortgage, and it now turns out that said insane person is the owner, he should be charged with the payment of the debt, but such purchaser is entitled to be reimbursed for the interest paid by him to protect his equities in the property.

6. ———: Rents: Reversal as to Part of Period. Where the trial court erroneously failed to allow to plaintiff for the rental value of the premises adjudged to belong to him for certain years, and the cause must therefore be remanded for that reason, and defendant's own testimony shows that the rental value for the other years was twice the amounts allowed by the trial court, the plaintiff on the re-trial should be allowed the full value of the rents for those other years.

7. ———: Insurance: Offset for Permanent Improvements: Theory of Trial. A party on appeal is held to the theory on which he tried the case. Where appellant was adjudged to be the owner of the land, and at the trial asserted that respondent was not entitled to an allowance for permanent improvements because they had been destroyed by fire, and that such loss, which was covered by insurance, was respondent's, and the trial court accepted his theory and refused to allow respondent for any permanent improvements made by him, or for any of the premiums he had paid for the insurance, nor required him to account for the insurance he might thereafter receive, the trial court, upon a remanding of the case, will not be required to charge respondent with whatever money is received by him from the insurance company.

Appeal from Grundy Circuit Court.—*Hon. L. B. Woods,* Judge.

REVERSED AND REMANDED (*with directions*).

*George Hall, O. M. Shanklin* and *Hubbell & Hubbell* for appellant.

(1) The trial court erred in rendering judgment in favor of respondent against appellant for purchase money in the sum of $2600 and interest thereon, because respondent is only a grantee of a grantee of the pretended guardian of appellant and has no legal or equitable claim against appellant for his purchase money, which respondent paid to Berry, his grantor, solely, under the terms of a warranty deed. McKenzie v. Don-

nell, 151 Mo. 469; Dewey v. Algire, 55 N. W. 276, 37 Neb. 6, 40 Am. St. 469; Hovey v. Hobson, 53 Me. 457, 89 Am. Dec. 705; German Savings Soc. v. DeLashmutt, 67 Fed. 399; 23 Am. & Eng. Ency. Law (2 Ed.), 482 to 485; Brown v. Baldwin, 121 Mo. 125; Kugel v. Knuckles, 95 Mo. App. 670; Patterson v. Booth, 103 Mo. 414; McDonald v. Quick, 139 Mo. 498; Dormitzer v. German Sav. Soc., 62 Pac. 890, 23 Wash. 132; Brush v. Ware, 10 L. Ed. 679; Rogers v. Walker, 47 Am. Dec. 470, 6 Pa. St. 971; Dexter v. Hall, 21 L. Ed. 73, 82 U. S. 9, 15 Wall. 9, 28; Shanklin v. Boyce, 275 Mo. 5; Building & Loan Assn. v. Eveler, 237 Mo. 679; Bank v. Shanklin, 174 Mo. App. 639; Hunter v. Hunter, 79 Am. St. 845. (2) Hughes, the pretended successor of Berry, as guardian did not sell the property in controversy for cash as provided in the order of sale and as provided by statute, and the whole proceeding between Hughes and Berry was void and illegal, and the pretended order of approval was void and illegal; the assumed twenty-five hundred dollars purchase money, assumed to have been paid by Berry to the pretended guardian, was not paid in cash, or otherwise, to the pretended guardian, but was taken out of Shanklin's estate under the pretense of reimbursing Berry for his exchange and trade of his own property to Shanklin's wife; the assumed $2500 purchase money went from Shanklin's estate to Berry instead of Berry to Shanklin. This was a fraud in law and in fact against Shanklin, and equity will not aid in the perpetration of a fraud, such as this, by subrogation or otherwise; and for this reason, the respondent, nor any one else, could be subrogated to any alleged rights or privileges of Berry, the fraudulent grantee in the pretended guardian's deed. Secs. 430, 505, 506, R. S. 1909; 37 Cyc. 372, 380, 381; 16 Cyc. 142, 194; 16 Am. & Eng. Ency. Law (2 Ed.), 593; 27 Am. & Eng. Ency. Law (2 Ed.), 204, 241; Tallent v. Fitzpatrick, 253 Mo. 18; Freeman on Void Judicial Sales (4 Ed.), secs. 4a, 9, 21, 36, 40, 50; Rannells v. Gerner, 80 Mo. 480; King v. Sipley, 25 Am. & Eng. Ann. Cas. 1912D, 704, 166 Mich. 258, 34 L. R.

A. (N. S.) 1058; 14 R. C. L. 576; 12 R. C. L. 1127; Kearnes v. Nickse, 10 Am. & Eng. Ann. Cas. 420, 80 Conn. 23; Woodward v. Jewell, 25 L. Ed. 481, 140 U. S. 247; Perin v. Megibben, 53 Fed. Rep. 97; Miller v. Staggs, 266 Mo. 449; Parker v. Bowers, 84 S. W. 382; German Savings Soc. v. Tull, 136 Fed. 1; Milwaukee Ry. Co. v. Stouter, 13 Wall. 517, 20 L. Ed. 543. (3) Without considering the fraudulent procurement of Shanklin's property by Berry, the respondent does not show a state of facts which would authorize him to be subrogated and substituted to any alleged rights or privileges of the said Berry against the appellant for the purchase money which the respondent paid to his grantor, Berry. 37 Cyc. 447, 448; Ins. Co. v. Middleport, 31 L. Ed. 537, 124 U. S. 534; McKenzie v. Donnell, 151 Mo. 471; Bank v. Shanklin, 174 Mo. App. 646; Berry v. Stigall, 253 Mo. 690; German Loan Soc. v. DeLashmutt, 67 Fed. 401; Roberts v. Best, 172 Mo. 67; McDonald v. Quick, 139 Mo. 484; 27 Am. & Eng. Ency. Law (2 Ed.), 246, 204; Implement Co. v. Jones, 143 Mo. 253; Valle v. Fleming, 29 Mo. 160; 37 Cyc. 373, 391; Shanklin v. Boyce, 275 Mo. 5. (4) Respondent had personal knowledge and actual notice of the insanity of appellant at all times, and the fact that the Probate Court proceedings were held without his presence and without notice being served on appellant was spread of record in the chain and line of respondent's title; and the fact that the pretended guardian's deed of May 3, 1900, was executed, jointly, by said pretended guardian and Nora B. Shanklin was shown in the chain and line of his title and, therefore, the respondent was not a purchaser in good faith, for value, without notice for any purposes in this case. 39 Cyc. 1688; Shanklin v. Boyce, 275 Mo. 5; Halley v. Troester, 72 Mo. 73; Heard v. Sack, 81 Mo. 610; Gillespie v. Gouly, 52 Pac. 816, 120 Cal. 515; 14 R. C. L. sec. 40, pp. 584, 585; Frazier v. Peakins, 64 Kan. 615, 68 Pac. 24, 57 L. R. A. 575; Reeder v. Barr, 22 Am. Dec. 762, 4 Ohio, 446; Brown v. Baldwin, 121 Mo. 107; Lee v. Bowman, 55 Mo. 400; Lodge v. Simonton, 23 Am. Dec. 36, 48; Tydings v. Pitcher, 82 Mo. 379;

McArthur v. Scott, 28 L. Ed. 1015, 1025, 1036; Cordova v. Hood, 21 L. Ed. 587; Brush v. Ware, 10 L. Ed. 672, 40 U. S. 93; Coal Co. v. Doran, 35 L. Ed. 1072, 142 U. S. 417; Turner v. Edmonston, 210 Mo. 411, 124 Am. St. 739.; Cobe v. Lovan, 193 Mo. 235, 112 Am. St. 480, 4 L. R. A. (N. S.) 439; Gross v. Watts, 206 Mo. 373, 394; 27 R. C. L. sec. 481, pp. 710, 715; 20 R. C. L. sec. 7, pp. 346, 347, 353; Building & Loan Assn. v. Eveler, 237 Mo. 679; Sec. 2401, R. S. 1909.

*L. A. Warden, J. C. Wilson* and *A. G. Knight* for respondents.

(1) Conceding the irregularities of the proceedings adjudging plaintiff insane, and that the deed of Hughes, his second guardian, as absolutely void, and likewise the warranty deed from Berry, the grantee, to defendant Ward, yet plaintiff's estate received the benefit of this very property, and where this is so an owner or his heirs cannot attack the sale, as against a *bona-fide* purchaser, without refunding the purchase money, with simple interest, together with all sums laid out by him in improvements, and a liberal allowance for all trouble, costs and expenses incurred by him, including just allowances for necessary expenses of repair, management and improvement. 16 R. C. L. sec. 75, note 11; Clay v. Freeman, 118 U. S. 97, 30 U. S. (L. Ed.) 104; Penn, v. Heisey, 19 Ill. 295, 68 Am. Dec. 597; Muir v. Berkshire, 52 Ind. 149; Wilson v. Brown, 82 Ind. 471; Banks v. Bales, 16 Ind. 423; Burnes v. Ledbetter, 56 Tex. 282; Jones v. Smith, 55 Tex. 383; O'Brien v. Harrison, 59 Iowa, 686, 12 N. W. 256, 13 N. W. 764; Kendrick v. Wheeler, 85 Tex. 247, 20 S. W. 44; Douglas v. Bennett, 51 Miss. 680; Burleigh v. Bennett, 9 N. H. 15, 31 Am. Dec. 213; Vale v. Fleming, 19 Mo. 454; Same Case, 29 Mo. 152; Schafer v. Pansey, 76 Mo. 365; 2 Woerner, Am. Law Armin. 1080, 1081; Cunningham v. Anderson, 107 Mo. 371; Mobley v. Nare, 67 Mo. 546; Long v. Joplin Co., 68 Mo. 422; Shroyer v. Nickell, 55 Mo. 264; Henry v. McKarlie, 78 Mo. 416;

Wellsly v. Lincoln Co., 80 Mo. 424; Burden v. Johnson, 81 Mo. 318; Price v. Estill, 87 Mo. 378; Sampson v. Mitchell, 125 Mo. 217; Stump v. Hornback, 109 Mo. 272; Hull v. Hull, 35 W. Va. 155, 29 Am. St. 800; Iron Co. v. Fullenwider, 87 Ala. 584, 13 Am. St. 73; Elliott v. Labarre, 2 La. 326; Evans v. Snyder, 64 Mo. 516; Griffin v. Nicholas, 224 Mo. 275, 312-340.; Bruschke v. Wright, 166 Ill. 183, 57 Am. St. 125; Ray v. Detchon, 79 Ind. 56; O'Brien v. Harrison, 59 Iowa, 686; Richards v. Morton, 18 Mich. 255; Jellison v. Halloran, 44 Minn. 199; Rogers v. Benton, 39 Minn. 39, 12 Am. St. 613; Bonner v. Lessley, 61 Miss. 392; Winslow v. Clark, 47 N. Y. 261. (2) Point II of appellant's brief is not well taken. The answer is two-fold. (a) As long as Shanklin had any estate, whether his guardian was one *de facto* or *de jure,* such estate was in law and morals, subject to the support and maintenance of his wife and children. It is horn-book law that Shanklin's estate was liable to anyone, whether guardian or otherwise, that furnished his wife and children necessary support. 21 Cyc. 1217, 1218, 1219. (b) And in equity, a third person supplying a married woman with money for necessaries, is permitted to recover from the husband the amount of such sum actually expended for necessaries by her. 21 Cyc. 1222, 1223, note 42; Reed v. Crissey, 63 Mo. App. 184; Moran v. Montz, 175 Mo. App. 360, 162 S. W. 323. (c) Conceding that Hughes reported the $8900 as cash received from Berry for the sale of the property in question, and other properties, when the transaction in fact was a mere credit to Berry for money for which the estate was validly in debt to Berry, and for which Shanklin had received full benefit, no such irregularities and non-observance of statutory requirements will authorize a court in equity to take the property away from Berry, or his grantee, and give it back to Shanklin, and at the same time permit Shanklin to hold on to the benefits of his estate, which he received in full, and as well to the improvements, taxes, and to allow him in addition thereto, rents. Such a result is unthinkable in a court of equity. 16 R. C. L. sec. 76, p.

105, note 2; Penn v. Heisey, 19 Ill. 295, 68 Am. Dec. 597; Griffin v. Nicholas, 224 Mo. 275, 340; Bond v. Montgomery, 56 Ark. 563, 35 Am. St. 119; Hull v. Hull, 35 W. Va. 155, 29 Am. St. 800; Jones v. French, 92 Ind. 138; Evans v. Snyder, 64 Mo. 516; Elliott v. Labarre, 2 La. 326; Kendrick v. Wheeler, 85 Tex. 247, 20 S. W. 44; Eisberg v. Phillips, 197 Mo. App. 329, 334; Henry v. McKarlie, 78 Mo. 416. (d) Berry in making provision for the support and maintenance of Shanklin's wife and children, and for the wife's inchoate right of dower, can in no sense be treated as a stranger or volunteer, as he was at least acting under color of authority, and so acting he had and has an equitable right to be reimbursed for such expenditures, the same as though his appointment had been perfectly valid. 16 Am. & Eng. Ency. Law, (2 Ed.), p. 593; Jessup v. Jessup, 17 Ind. App. 177; Coolidge v. Allen, 82 Me. 23. (3) There is nothing in appellant's point 4, that because Ward did not search back through the chain of his title and discover the defect that leads to the overthrow of the judgment adjudging Shanklin insane for the reason that no notice had been given him, that therefore Ward is not a purchaser in good faith, for value, without notice. Ward should not be held remiss in not detecting a defect which it took the bench and bar of this State fifty years to discover. The essential matter for investigation is, did Ward believe he had a good title. "Not that by a recondite investigation he might have ascertained he had a bad one or a limited one." Gallenkamp v. Westmeyer, 116 Mo. App. 680, 688; Eisberg v. Phillips, 197 Mo. App. 334; Stump v. Hornback, 15 Mo. App. 367, 94 Mo. 35, 109 Mo. 272; Brown v. Baldwin, 121 Mo. 107.

RAGLAND, C.—This is a suit in equity to set aside two deeds purporting to convey title to real estate, to recover the possession of the premises and for an accounting of the rents and profits.

In November, 1895, and prior thereto, plaintiff was actively engaged in business in the city of Trenton. He

owned five substantial store buildings centrally located
in the business district of the city and some twenty
small residences in other parts, all of which he rented.
He also owned an interest in the local gas and electric
light plant, a one-fourth interest in the Trenton Land
Company, and nineteen of the fifty-five shares of the
Grundy County Coal Company. The Land Company
owned 1600 or 1700 acres of land worth from $20 to $25
per acre. The Coal Company seems to have had a capital
stock of only $5,500; it operated almost exclusively on
borrowed capital; and in November, 1895, it owed $40,-
000. Plaintiff was the manager and conducted the com-
pany's business, practically as though it was his own,
using it as a clearing house, so to speak, for all of his
other business. The value of plaintiff's holdings at the
time just mentioned, according to his estimate, was $130,-
000; his individual indebtedness was from $25,000 to
$30,000; and he seems to have been personally obligated
for some of the debts of the Coal Company as its surety.
His account at one of the local banks was overdrawn to
the extent of $400.

On the date last mentioned plaintiff became insane.
He was found in his office by a business associate in a
dazed condition, turning through his books and ledgers,
and saying that he was an embezzler and had ruined
himself and friends. He developed suicidal tendencies
and was taken to a private sanitarium in St. Louis. After
receiving treatment there for quite a while he was taken
to Chicago and there operated on by the late Dr. John B.
Murphy. He was then taken to the home of a brother
in Arkansas where he remained until October, 1898, when
he was removed to the State Hospital for the Insane at
St. Joseph, Missouri. He was confined in the latter in-
stitution until July, 1910, except for a period of about
two years in 1901 and 1902, during which time he was in
the care of a brother-in-law at the latter's home in Tren-
ton. Continuously from November 26, 1895, to July 15,
1910, plaintiff was insane and incapable of managing
his affairs. On the latter date he was discharged from

the state hospital as restored, and has ever since been of sound mind.

At the time he became insane, plaintiff's family consisted of his wife, their three small children, and three daughters by a former marriage. He had still another daughter, Minnie, who had married and was living with her husband, Corydon L. Berry. Plaintiff was a devoted husband and father, and maintained his family in a style of living that fully comported with his means and with his prominent social and business standing. To two of his daughters he had given a four years' course in college, and at the time he was stricken he was sending the two next younger.

Three or four months after plaintiff had been taken to the sanitarium at St. Louis, his son-in-law, Berry, filed in the Probate Court of Grundy County information in writing alleging that plaintiff was of unsound mind and incapable of managing his affairs and praying that an inquiry be had. On March 11, 1896, the day set for the hearing, the court caused this to be spread upon its records: "It appearing to the court that said Nathaniel Shanklin is now confined in a hospital in the city of St. Louis, and unable to attend and be present at said inquiry, or to be served with notice thereof, it is ordered that said proceedings be had without his presence and without notice being served upon him," and then proceeded with the inquest. A jury after hearing evidence returned a verdict finding plaintiff of unsound mind and incapable of transacting his own business, and judgment was entered accordingly. Berry was thereupon appointed guardian of the person and estate of plaintiff as an insane person; he complied with all the statutory requirements with respect to qualifying as such guardian, and entered upon the discharge of the duties and functions pertaining to such a guardianship.

Soon after Berry's appointment as guardian, plaintiff's creditors became insistent in demanding immediate payment of their claims; suits were threatened and one or two were brought. There were not sufficient per-

sonal assets available to pay the debts and support plain-
tiff's family and it became necessary to sell some of the
real estate.  Orders for the sale of such of the real es-
tate as was necessary to supply the deficiency were made
by the probate court conformably to the provisions of
the statute in such cases made and provided, but plain-
tiff's wife, acting under the advice of her father, refused
to join the guardian in making deeds of conveyance for
the purpose of releasing her inchoate dower.  Under such
circumstances the real estate could not be sold except
at a great sacrifice.  To meet this situation the guardian
with the approval of the probate court entered into a
written contract with plaintiff's wife whereby she agreed
that in consideration of $10,000 she would support her-
self and maintain and educate her three minor children,
entirely relieving her husband's estate from the burden
thereof, and would join with the guardian in the con-
veyance of real estate sold pursuant to the orders of the
court.  This contract was fully performed on both sides.
Berry paid Mrs. Shanklin out of his own money and prop-
erty $10,000 and charged her husband's estate with the
amount thereof.  She thereafter during the remainder
of her life supported herself and her three children and
joined with her husband's guardian in the conveyances
of real estate.  She died in 1901, leaving intact apparent-
ly the principal of the fund that had been turned over to
her by Berry.  This was inherited by the three children,
and guardians were appointed for them.  One of them,
Helen, on becoming of age in 1911, received from her
guardian $3,600, and this she immediately turned over
to her father, the plaintiff.  The latter at the time he
received the $3,600 from his daughter had been fully ad-
vised as to the transaction between his wife and Berry,
and he knew the source from which the money had come.
However, he treated it as his daughter's and used and
applied it exclusively for her benefit.

Berry resigned as guardian October 3, 1898, and
H. J. Hughes was appointed to succeed him.  Berry's
final settlement, which was duly approved by the court,

showed the estate indebted to him to the amount of approximately $10,000. In May, 1900, Hughes, as guardian, pursuant to an order of the probate court, sold at private sale the property in controversy and other property belonging to plaintiff to Berry for the sum of $8,900, the appraised value. The sale was reported as having been made for cash and Hughes in his next settlement thereafter charged himself with that sum. However, he took credit for a like amount as paid to Berry in discharge of the estate's indebtedness to the latter. On May 3, 1900, Hughes, as guardian, and Mrs. Shanklin, as wife of plaintiff, executed a deed purporting to convey to Berry the property so purchased by him.

The property in controversy was valued at $2500 in the transaction had between Hughes and Berry. The latter made some repairs, and on December 26, 1904, sold and conveyed it to the defendant Ward for the sum of $2600. Ward immediately went into possession and had up to the time of the commencement of this action continuously occupied the premises as a residence. Presumably he is still in possession.

On affidavits theretofore filed by some of his relatives, an inquiry was had in the probate court on September 12, 1910, with respect to plaintiff's sanity. In that proceeding he was duly adjudged restored, and thereupon discharged from ward.

In 1909 or 1910 Ward borrowed $1200 to pay for a sidewalk and street paving in front of his premises and for constructing a sewer to connect the house with the public sewer on the outside. Upon the maturity of the obligation given for this money he applied for a loan of $1200 on the premises from the school fund of Grundy County. The county court declined to make the loan unless both plaintiff and Ward joined in the execution of the bond and mortgage. This they did on the ——— day of May, 1911, and Ward thereafter paid the annual interest thereon as it accrued. At the time of the trial these payments so made by him amounted to $504. From December 26, 1904, to July 1, 1919, the

day on which the trial of the case was concluded, Ward had paid all the taxes on the premises and kept them in repair—outside of a fire damage which occurred after the institution of this suit and with which we are not concerned. During that time property of like character in the city of Trenton increased in value from thirty to forty per cent irrespective of improvements.

The petition, which was filed June 25, 1913, alleges in substance that on November 26, 1895, plaintiff was the owner in fee of Block One in Nathaniel Shanklin's First Addition to the City of Trenton; that thereafter on May 3, 1900, while plaintiff was in an insane and helpless condition one Hughes wrongfully took possession of said property and attempted to sell and convey it to one Berry for a purported consideration of $2500; that thereupon Berry wrongfully went into possession and thereafter on December 26, 1904, while plaintiff was still insane, attempted to sell the property, and by deed purported to convey it to the defendant Ward, who has ever since wrongfully withheld the possession from the plaintiff; that at the times the purported conveyances were made the parties thereto were fully advised as to plaintiff's insane condition; and that said deeds constitute a cloud on plaintiff's title. The prayer is that the deeds be set aside, that possession be restored to plaintiff, and that defendant Ward be required to account for the rents and profits.

The separate answer of defendant Ward, after setting out at length the facts with respect to the attempted adjudication of plaintiff's insanity, the appointment of guardians, the administration by them of his estate and the sales of his real estate, avers: "that the proceeds of said sale to the said Corydon L. Berry went into the hands of plaintiff's guardian, as aforesaid, and were by him used for the benefit of said estate, and the payment of the plaintiff's indebtedness, and was used for the use and benefit of the plaintiff herein, and defendant avers that the plaintiff directly or indirectly received all of the proceeds of the sale of said real estate, or received the

benefit thereof; that said sale and purchase was made in good faith, without any notice on the part of this defendant of any defect or irregularity therein, and that he accepted said deed from said Corydon L. Berry and paid said purchase money believing and relying upon the facts that he was receiving an indefeasible and fee simple title in and to said property.''

The answer, after further averring the payment of taxes and the making of permanent improvements by Berry and Ward, prays that if it be held that plaintiff still has the legal title, ''the court shall by its judgment and decree, order and direct that plaintiff, as a condition precedent to obtaining the possession of said land, or ousting the defendant from the possession thereof, be required to pay to defendant, or into court for his use, the amount so paid said guardian, or the said Corydon L. Berry, for the purchase price of said land, and used for the benefit of plaintiff and his estate, with interest thereon, together with amounts paid out for improvements, taxes and repairs on said land, together with interest thereon, and that the amounts so found to be due shall be declared a lien on said land.''

The affirmative matters set up in the answer were put in issue by the reply.

The suit was originally instituted against both Berry and Ward; during its pendency Berry died, and it was revived in the names of his widow and heir. They filed no answer and have made no appearance in this court.

The trial court found and decreed that the proceedings in the probate court wherein plaintiff was adjudged to be a person of unsound mind and the subsequent appointments of guardians thereunder were void, and that the deed from Hughes, as guardian, to Berry was likewise void, conveyed no title and constituted a cloud on plaintiff's title. It further found that Ward was a purchaser in good faith; that he paid $2,600 as the purchase price of the property; that said sum inured to the benefit of plaintiff, and with the interest thereon from February 28, 1905, the date when it was paid by Ward to Berry,

amounted to $4,901; that Ward paid the state and county taxes on the property for the years from 1905 to 1918. inclusive, which with interest amounted to the sum of $1,037.91; that he also paid $504 interest on the money borrowed to pay for the sidewalk and paving; and that the aggregate of these sums, $6,442.91, less the rental value of the premises from 1905 to 1918, inclusive, with interest, amounting to $2,349.20, should be charged as a lien thereon. The court thereupon further ordered and adjudged that the deed from Hughes to Berry be set aside, that plaintiff was vested with the legal title and that he be restored to the possession of the premises—all on condition that he pay to the defendant Ward the sum of $4,093.71, which was thereby adjudged a lien on the property. The decree further exonerated Ward, as between him and plaintiff, from the payment of the $1,-200 school fund mortgage. From such judgment plaintiff appeals.

Appellant finds no fault with the trial court in charging the premises with a lien for the taxes paid by defendant Ward, with interest, nor with respect to the amount allowed him as and for the rents and profits. His complaint is: that the judgment is erroneous in so far as it requires him to refund the purchase money paid by Ward to Berry, and the interest paid by Ward on the school fund mortgage, and imposes upon him the sole liability for the payment of that mortgage.

I. It is assumed by counsel for both parties that the guardian's deed to Berry was void and conveyed no title because the initial proceeding in the probate court, having for its purpose the appointment of a guardian for plaintiff, was void, no notice thereof having been given him. [Shanklin v. Boyce, 275 Mo. 5; Hunt v. Searcy, 167 Mo. 158.] The only questions raised on this appeal, therefore, are those with respect to the character and extent of the equitable accounting, if any, that may be required at the hands of the plaintiff as a condition precedent to the granting of the relief he seeks.

*Good Faith.*

It should be said at the outset that there is not a particle of evidence in the record tending to show fraud, collusion or bad faith on the part of any one concerned in the attempted administration of plaintiff's property as that of an insane person, or on the part of those who purchased property from persons assuming to act as his guardian. And further, that the proceedings in the probate court under which the successive guardians for plaintiff were appointed were had in accordance with the law as it had been assumed to be and as it had been followed in this State for more than half a century. Hunt v. Searcy, supra, was not decided by this court until six years later. There was no reason, therefore, for either of the persons, who under appointment by the probate court assumed to act as plaintiff's guardian, to have any thought but that he was, while so acting, clothed with all the powers conferred by law upon the guardian of an insane person. Nor was there anything to call in question the authority of either in the premises in the minds of those who dealt with them as guardians.

II. Appellant's first contention is that the defendant Ward has no legal or equitable claim against him for the $2,600 paid by Ward to Berry as purchase money for the property in controversy. The court found that the $2,600 "went to the benefit and was received by the said Nathaniel Shanklin by reason of the purchase of said property." There does not seem to have been any basis of fact for this finding. The evidence merely discloses that Berry sold the property to Ward for $2,600, and that the latter paid that amount to the former, who presumably applied it entirely to his own uses. It may be reasonably claimed that the $2,500 paid to Hughes by Berry was used for Shanklin's benefit, but not the $2,600 paid by Ward to Berry. It is obvious, therefore, that if Ward has an equitable claim against Shanklin, with respect to the purchase money received by the latter's estate, it is one derived solely through Berry.

The first question for consideration then is: What would have been Berry's equities, if he had not sold the

property but had continued in possession and Shanklin had brought this suit against him alone? In advancing Mrs. Shanklin $10,000 for the support of herself and children out of his own means, to be repaid later by Shanklin's estate, Berry was perhaps in a technical sense a volunteer. There is no question, however, but that he thought, and with reason, that in furnishing such support he was discharging a duty incumbent upon him

Reimbursement. as Shanklin's lawful guardian, and had he in fact been such guardian his acts would have been valid and binding on his ward's estate. Under such circumstances it should not be held that he would have to abide the consequences of one "who either foolishly or for charity's sake pays the debt of another." Even if he had never been appointed guardian, or assumed to act as such, and independently of any such relationship to Shanklin or to his estate, he had furnished money for the procurement of necessaries for the latter's wife and minor children, he could have recovered it from Shanklin. [Reed v. Crissey, 63 Mo. App. 184, 191.] In this connection it may be observed that appellant makes no complaint as to the amount of money paid Mrs. Shanklin for the support of herself and the maintenance and education of her children. or as to the use she made of it.

Regardless of the form the transaction took, it is incontrovertable that the $2500 paid by Berry for the property in suit and the additional sums he paid for other property belonging to Shanklin furnished support for the latter's wife during the remainder of her life,

Equitable Lien. educated three of his minor children and maintained them for a period of approximately fifteen years. Not only that, but it effected a release of his remaining real estate from the encumbrance of his wife's inchoate dower, and thereby made it possible for the full value of such real estate to be applied to the payment of his debts. Twenty-five hundred dollars of this money was paid by Berry in good faith for the land in controversy, in the honest belief that he was get-

ting a good title; and after appellant has receive the benefit of the money so paid, by its having been applied to the support of his family and indirectly to the payment of his debts—burdens with which all of his property stood charged—he seeks to recover the land. As against Berry he would not be permitted to have both land and money; the land, if restored to him, would under equitable principles be charged with a lien in Berry's favor to the extent of the purchase money with interest. The maxim that we have borrowed from the civil law, "*Jure naturæ æquum est, neminem cum alterius detrimento et injuria fieri locupletiorem,*" is clearly applicable. [Berry v. Stigall, 253 Mo. 690; Valle's Heirs v. Fleming's Heirs, 29 Mo. 152.]

III. The evidence quite conclusively shows that the defendant Ward was a purchaser in good faith, for full value, without notice of any infirmity in Berry's title. Appellant, however, makes the point that the fact that

Notice.

the probate court proceedings were had without notice to him was shown by record constituting a part of Ward's chain of title, and hence Ward should not be permitted to say that he had no notice thereof. As to this it may be said that the question here is not whether Ward acquired title through Berry's deed—it is conceded that he did not—but whether under equitable principles he is entitled to have the land charged with the amounts expended by him in the payment of taxes and the making of permanent improvements. In the determination of that question the doctrine of constructive notice is without application. His good faith can be challenged only on the ground that he had actual knowledge of the defect in the title, or knowledge of such facts and circumstances as would have put a man of ordinary circumspection upon inquiry. [Brown v. Baldwin, 121 Mo. 106, 115.]

As was said by GOODE, J., in Gallenkamp v. Westmeyer, 116 Mo. App. l. c. 689, "the essential matter in this connection is the good faith in which the improve-

ments were made—the fact that the party in possession made them believing he had a good title; not that, by a recondite investigation, he might have ascertained he had a bad or a limited one." Even if Ward knew at the time he received the deed from Berry and paid the purchase money that the probate court proceeding was had without notice to Shanklin, yet, unless he also knew that by reason thereof the proceeding was void, or that Berry had no title, he would not be precluded from relief. Where manifest justice and equity require it, a court of equity will relieve one from the consequences of a mistake as to title to real estate, even though the mistake is one of law. [10 R. C. L., p. 311 sec. 54.] It is entirely clear that under the circumstances of this case the respondent is entitled to be reimbursed for the moneys expended by him, on the faith of his title, in making permanent improvements and in discharging liens against the property.

*Mistake of Law.*

IV. While Berry had no legal title to the real estate in controversy, yet, as already shown, he had an equitable interest therein—the right to have it charged with the repayment of the purchase money and taxes paid by him, with interest up to the time of such repayment, less the rental value, with interest, during the time he was in possession; and his deed to Ward invested the latter with that interest. [Valle's Heirs v. Fleming's Heirs, supra; Bruschke v. Wright, 166 Ill. 183; Bright v. Boyd, 1 Story, 478.] The trial court, therefore, in stating the account between Shanklin and Ward, should have allowed the latter $2500 with interest from May 3, 1904, instead of $2600 with interest from February 28, 1905, and taxes for the years 1900 to 1918, inclusive, with interest, instead of for the years 1905 to 1918; and he should have deducted from the total of these amounts the rental value of the premises, with interest, from May 3, 1900, to the time of entering the decree. In this connection it should be said that no question is raised by either party with respect to the allowance of interest by the court below,

*Stating the Account.*

and in any event the court's action in that regard was in accordance with the equities of the case. [Woerz v. Rademacher, 120 N. Y. 62; Stump v. Hornback, 109 Mo. 272, 281.]

V. The item of $504 allowed respondent by the circuit court was for seven annual interest payments on the $1200 school-fund mortgage. The original indebtedness represented by the mortgage was incurred for the

**Mortgage: Interest.**

payment of the cost of street improvements which presumably constituted a lien on the property in controversy. In 1911 when the mortgage was given, the title to the property was in such a state of uncertainty that neither appellant nor respondent could borrow money on it without the other joining in the execution of the lien papers. Evidently they both then thought that the property should be charged with the payment of the $1200 and the interest thereon, because they joined in the bond and mortgage; and that the one who ultimately secured the title should take with it the burden of the debt. It turns out that appellant is the owner of the property; the debt, therefore, is likewise his, and the court very properly charged him with its payment. It was necessary for respondent to pay the annual interest as it accrued in order to protect his own equities in the property, hence he is entitled to have it charged with a lien in his favor to the amount of such payments.

We are unable to modify the judgment of the trial court so that it will conform to the equitable principles we have pointed out as controlling on the facts in proof, because the record contains no satisfactory evidence as to the rental value of the premises from 1900 to 1905, while in the possession of Berry, and no evidence at all as to the payment of taxes during that period. The judgment, therefore, will be reversed and the cause remanded with directions to the circuit court to hear such evidence as the parties may desire to offer as to the items just mentioned, and on the finding with respect

to them, in addition to the findings already made, to enter a decree in accordance with the views herein expressed. *Small* and *Brown, CC.,* concur.

PER CURIAM:—The foregoing opinion of RAGLAND, C., is adopted as the opinion of the court. All of the judges concur.

## ON MOTION TO MODIFY

RAGLAND, C.—Appellant asks that the foregoing opinion and the judgment here in conformity therewith be so modified that the trial court will be required to hear and try *de novo* the issue with respect to the rental value of the premises in controversy from May 3, 1900, to the time of entering the decree, and, in stating the account between appellant and respondent, Ward, to charge the latter with "whatever is received" by him from the insurance company.

The court below in its finding and decree charged respondent with rents which in the aggregate were but little more than one-half of the rental value of the premises for the period covered, as fixed by respondent himself. In doing so it was manifestly in error. But appellant in his original briefs filed here expressly waived all questions as to the correctness of the trial court's holdings with respect to the rents, and sought a reversal on other grounds. He now insists, however, that his waiver was for the purpose of the appeal only, and that in as much as a further hearing is to be had in order to determine the rental value from 1900 to 1905, the question of the rental value for the entire period should be tried anew. This contention should be allowed.

With respect to the insurance the references to it in the records here are so meager and fragmentary that it is impossible to form an intelligent opinion from them as to the respective rights of the parties in relation to it. It does appear that after the institution of this suit a roof on the dwelling house was

*Rents.*

*Insurance.*

burned and the building otherwise damaged by fire, and that Ward at the time had a policy of insurance on it in his favor in the sum of $2500. There are intimations in the briefs of counsel that Ward and the insurance company were engaged in litigation over the matter, and that appellant was trying in some way to intervene therein. So that respondent has not yet received any insurance, and may never do so. But be that as it may, there is sufficient in the record to indicate that appellant has changed front since the trial. From his pleading and from one of his declarations of law, as well as from certain objections he made during the reception of the evidence, his position then seems to have been that respondent was not entitled to any allowance for permanent improvements made on the premises, because the enhanced value by reason thereof was lost through damage by fire, and that such loss, which was covered by insurance, was respondent's. The trial court seems to have accepted appellant's theory, because it refused to allow respondent for any permanent improvements, or for any of the premiums he had paid for insurance; neither did it require him to account for insurance that he might hereafter receive. This must have been entirely satisfactory to appellant, for there is no reference in his motion for a new trial to the court's action with respect to the insurance. He is not now entitled to have a new trial as to this phase of the case.

As additional taxes have accrued, and may have been paid by respondent, since the rendition of the judgment *nisi*, our opinion and judgment will be so modified that **Taxes.** the trial court may hear additional evidence as to the payment of taxes by respondent or his grantor, regardless of the time when made, as well as evidence relating to the rental value. Accordingly, the circuit court is directed to hear such further evidence as the parties may desire to offer as to the rental value of the premises from May 3, 1900, to the time of entering the decree, or the surrender of the possession by respondent if that should occur sooner, and as to the pay-

ment of taxes during said period, and on findings with respect to them, in addition to the findings already made on other issues, to enter a decree in accordance with the views expressed in this and in the original opinion. *Small, C.,* concurs; *Brown, C.,* absent.

PER CURIAM:—The foregoing opinion by RAGLAND, C., is hereby adopted as the opinion of the court. All of the judges concur.